UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60850-CIV-ALTMAN/Hunt

**STEVEN MALCOLM**,

    *Plaintiff*,

v.

**KILOLO KIJAKAZI,**
*Acting Commissioner of Social Security*,

    *Defendant.*

_____/

# ORDER

    The Plaintiff, Steven Malcolm, appeals the Defendant's denial of his application for Social Security benefits. The parties filed cross-motions for summary judgment—*see* Plaintiff's Motion for Summary Judgment ("Pl.'s MSJ") [ECF No. 21]; Defendant's Combined Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment ("Def.'s MSJ") [ECF No. 22]—which the Court referred to United States Magistrate Judge Patrick M. Hunt for a report and recommendation, *see* Order of Referral [ECF No. 20].

    In his Report & Recommendation (the "Report") [ECF No. 23], Magistrate Judge Hunt suggested that the Plaintiff's MSJ be denied and that the Defendant's MSJ be granted. *See* Report at 1. The Plaintiff filed objections, *see* Objections [ECF No. 24], and we conducted a *de novo* review of those portions of the Report to which the Plaintiff has properly objected.[1] For the following reasons, we **ADOPT** the Report, **DENY** the Plaintiff's MSJ, and **GRANT** the Defendant's MSJ.

---

[1] *See* FED. R. CIV. P. 72(b)(3) ("*Resolving Objections.* The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."). We also reviewed the unobjected-to portions of the Report for

## BACKGROUND[2]

On December 31, 2015, the Plaintiff sought supplemental security income—claiming that, since July 5, 2015, he's had tarsal tunnel syndrome arising from a surgery that was performed on his right ankle. *See* R. at 307. After his application was denied, *id.* at 146–54, the Plaintiff appeared at a hearing before an administrative law judge ("ALJ"), *id.* at 70–101. The ALJ found that the Plaintiff was not disabled, but the Appeals Council remanded (for reasons that aren't relevant here). *Id.* at 123–33. The Plaintiff appeared at a second hearing, and the ALJ issued another unfavorable ruling. *Id.* at 12–27. This time, the Appeals Council denied the Plaintiff's request for review. *Id.* at 1–3.[3] The Plaintiff then appealed the ALJ's decision to us.

In his final decision, which we review here, the ALJ applied the Social Security Administration's five-step sequential evaluation.[4] *See* ALJ Decision at 3–12. At step one, he concluded

---

clear error. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate [judge]'s factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."). And, as we explain below, we find no clear error in the unobjected-to sections of the Report.

[2] The following facts are taken from the certified administrative record. *See* Social Security Transcript ("R.") [ECF No. 15]. The ALJ Decision can be found at R. 15–27. Since we cite it so often, though, we'll separately paginate it—*i.e.*, we'll refer to the first page of the ALJ Decision as ALJ Decision at 1, rather than R. at 15.

[3] The Defendant acknowledges that the Plaintiff has exhausted his administrative remedies and that the case is now ripe for review under 42 U.S.C. § 405(g). *See* Def.'s MSJ at 2.

[4] To determine whether a claimant is disabled, the Social Security regulations outline the following five-step inquiry:

> (1) [W]hether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functioning capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)).

that the Plaintiff hadn't engaged in substantial gainful activity since July 5, 2015—the alleged onset date of the disability. *Id.* at 3. At step two, he found that the Plaintiff had a combination of "severe" impairments, which included "status post[-]surgical decompression of tarsal tunnel and medial/planter nerves bilaterally and right foot drop." *Id.* The Plaintiff had other impairments, too—including "impingement syndrome of the right shoulder [and] mild chondrosis of the patella and the medial tibiofemoral, compartment, illotibial [sic] band friction syndrome"—but the ALJ determined that those impairments caused only short-term limitations, and (therefore) "failed to meet the durational requirement of causing more than minimal limitation for at least 12 months to be considered severe." *Id.* at 3–4. Moreover, when considered "singly and in combination," the impairments didn't "limit the ability to perform basis work activities and were therefore nonsevere." *Id.* at 4.

At step three, the ALJ held that the Plaintiff didn't have a combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. § 404. *Id.*

At step four, after a thorough review of the entire record, the ALJ found that the Plaintiff had the residual functional capacity ("RFC") to perform "medium work," as defined in 20 C.F.R. § 404.1567(c)—albeit with some limitations. *Id.* at 4–11. And, although the Plaintiff's medical impairments could reasonably be expected to cause the symptoms he was allegedly experiencing, the ALJ concluded that the Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were *not* consistent with the medical evidence. *Id.* at 5. In support of this conclusion, the ALJ adduced a substantial trove of evidence, *see id.* at 5–11, which we'll summarize here.

*First*, the ALJ relied on a post-surgical exam from November 2015, in which (1) the examiner couldn't reproduce *any* of the pain the Plaintiff had reported and (2) the Plaintiff had "demonstrated a full ankle, subtalar, and mid-foot range of motion, all without pain." *Id.* at 5–6. In that exam, the Plaintiff showed "a full five out of five strength throughout," and "there was no sign of Tinel's over the tarsal tunnel on either side." *Id.* at 6. He also didn't show any signs of erythema, warmth, or

3

swelling. *Id.* The findings from this exam were thus "consistent with the findings of other examiners" and "numerous imaging and tests the [Plaintiff] ha[d] undergone," including an MRI of his ankles that "revealed no significant abnormality." *Id.*

*Second*, the Plaintiff had asked his physician, Dr. Steven Steinlauf, "to fill out paperwork stating that the [Plaintiff] is unable to work"—a request Dr. Steinflauf "refused, stating he could not do so because this would be contrary to his multiple examinations of the [Plaintiff] with normal findings, imaging, and testing." *Id.* Treatment notes from Dr. Bruce Zaret "mirror[ed] Dr. Steinlauf's findings." *Id.*

*Third*, the ALJ cited a series of medical exams from November 2016 to May 2017. In the November 2016 exam, the Plaintiff admitted that his symptoms had "notably improved" and that "he was in no apparent distress." *Id.* at 7. Although he was diagnosed with "bilateral tarsal tunnel syndrome," his other exams around that time revealed that his "shoulder pain and gain and neurological findings were within normal limits." *Id.* A March 2017 test did reveal bilateral residual tarsal syndrome—but the Plaintiff "rejected proposed spinal cord stimulation and stated he wished to live with his condition at that juncture." *Id.* He was thus "instructed on conservative treatment measures and the physician noted he was hopeful he would still do well with same." *Id.* A month later, in April 2017, the Plaintiff "was noted to have normal gait, no limp, and no assistive device as well as no tenderness, normal strength and normal range of motion." *Id.* And, a month after that, "on his bedside exam he had completely normal anterior tib, EHL, EDB, FHL, flexor digitorum, toe abductors, posterior tib, peroneus longus, gastroc, anterior tib, quad and knee flexors bilaterally. His knee jerks are 2; his ankle jerks are 2; and no superficial, peroneal, deep peroneal, sural, mediolateral and plantar distribution sensory deficits." *Id.* During that same May 2017 exam, "his bipedal and monopedal heel and toe stance [were] normal," and the treating physician "did not find any evidence of any residuum of his right peroneal neuropathy." *Id.*

*Fourth*, the ALJ pointed to the Plaintiff's most recent medical exam, on June 4, 2019, in which the Plaintiff demonstrated an an "antalgic, albeit independent gait; a mild foot drop on the right side; tenderness on the medial ankle about the flexor tendons and tarsal tunnel region bilaterally; decreased extension and dorsiflexsion at the ankle in the right; decreased eversion at the subtaler joint; decreased strength of the right leg for dorsiflexion of 4/5; and a positive tinels test of the left medial tarsal tunnel region and right medial tarsal tunnel region." *Id.* Notwithstanding those symptoms, the Plaintiff had "normal sensation otherwise; was noted to be in no acute distress; had no obvious deformity and normal alignment; normal great toe flexion, bilaterally; normal plantar flexsion [sic] at the ankle, inversion at the subtalar joint, and eversion at the subtalar joint; and normal motor strength in the left leg." *Id.*

The ALJ also concluded that the Plaintiff's testimony regarding the efficacy of pain management was inconsistent with "the longitudinal record of evidence," as the Plaintiff had been "recommended for physical therapy and was noted to experience a decrease in symptoms after sessions with treatment notes reflecting he tolerated exercises well." *Id.* at 8. In addition, the ALJ noted that the Plaintiff "reported improvement . . . and he admitted that injections helped his pain symptoms." *Id.* Accordingly, the ALJ decided that the Plaintiff's allegations—*i.e.*, that he had "received no improvement in his condition"—were "not only inconsistent with objective findings which generally show normal [ ] gait and imaging which shows mild to benign abnormalities, but also inconsistent with the claimant's own reports in the record and treatment notes from providers about recommendations for conservative treatment." *Id.* The Plaintiff's contentions, according to the ALJ, were also inconsistent with his reported daily activities, including his "ability to handle all personal care needs; shop; drive; perform household chores; prepare small meals; fish; and ride his motorcycle, which requires use of his feet for changing gears and balancing of the 600+ lb. vehicle at stop lights." *Id.*

As for the opinions of the Plaintiff's physicians, the ALJ gave diminished weight to the assessments of Drs. Molis, Wolansky, and Segall. *Id.* at 8. Starting with Dr. Arthur Segall—the only treating physician whose opinions are relevant here[5]—the ALJ found that, while *some* of his opinions were consistent with the objective evidence, many of his findings were internally inconsistent. *Id.* at 10. For example, Dr. Segall "gave [two] differing opinions" during an exam he conducted on June 7, 2016 about (1) how long the Plaintiff could stand and (2) how much weight he could carry. *Id.* In addition, from June to August 2016, Dr. Segall's exams "primarily reflect[ed] [that] the [Plaintiff's] status [was] unchanged; however, the [Plaintiff] was assessed to be able to stand and walk for longer." *Id.* Similarly, in September 2016, the Plaintiff's "capabilities greatly increased with the ability to stand or walk for 30 to 40 minutes in a[n] hour; however, he was back down to only 15 to 20 minutes in an hour by October with no significant changes noted on the physical exam." *Id.* In December 2016, Dr. Segall noted "improving foot drop, range of motion and strength, but unchanged sensation" and "found him less limited than previously." *Id.* In January 2017, "there was no noted improvement," and the Plaintiff "had decreased motor strength." *Id.* Nonetheless, Dr. Segall's "opinion did not change." *Id.*

Finally, Dr. Segall's last RFC assessment was not only internally inconsistent but "also inconsistent with his most recent exam and objective findings on the [Plaintiff]." *Id.* at 11. So, for instance, he "opined the [Plaintiff] could never use bilateral foot controls; however, in the same form he stated the [Plaintiff] could occasionally operate a motor vehicle and after the physical exam, he noted the [Plaintiff] could drive with his affected foot." *Id.* Dr. Segall also "assessed the [Plaintiff] capable of standing or walking no greater than 30 to 40 minutes per hour divided equally; however, in the completed form he opined the claimant could only stand 10 to 15 minutes at a time and could

---

[5] The Plaintiff doesn't object to the ALJ's decision to give limited weight to the opinions of Drs. Molis and Wolansky. *See generally* Pl.'s MSJ; Objections.

6

only stand 4 hours total in a day." *Id.* The ALJ pointed out that "both forms were complete[d] on the same day." *Id.* In short, notwithstanding Dr. Segall's "long treating source relationship with the [Plaintiff]," the ALJ "generally [found] his opinions to be inconsistent with each other and often inconsistent with his noted objective findings or lack of additional findings." *Id.*

The ALJ went on to determine that the Plaintiff *could* perform his past relevant work as a baker—and found that he *could* undertake other occupations that exist in significant numbers in the national economy. *Id.* at 11–12. The ALJ thus concluded that the Plaintiff wasn't disabled. *Id.* at 12–13.

## STANDARD OF REVIEW

Our review of the ALJ Decision is "limited to an inquiry into whether there is substantial evidence to support the findings of the [ALJ], and whether the correct legal standards were applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The latter determination—whether the ALJ applied the correct legal standard—is subject to *de novo* review. *See Graham v. Bowen*, 790 F.2d 1572, 1574 (11th Cir. 1986). But we review the ALJ's factual conclusions with substantial deference: "whatever the meaning of 'substantial' in other contexts, the threshold for . . . evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The Court may not "reweigh the evidence, or substitute [its] judgment" for the ALJ's—even if the "evidence preponderates against the [ALJ's] decision." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (cleaned up).

When an ALJ discounts a treating physician's opinions, the ALJ must have had "good cause" to do so. "'Good cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the physician's own medical records." *Pritchett v. Comm'r, Soc. Sec. Admin.*, 315 F.

7

App'x 806, 810 (11th Cir. 2009). As with other determinations, the ALJ must support this credibility determination with "substantial evidence," as defined above. *See, e.g.*, *Petteway v. Comm'r of Soc. Sec.*, 353 F. App'x 287, 290 (11th Cir. 2009) ("Because 'good cause' existed to reject the opinion of [the claimant's] treating physician, and the ALJ provided specific reasons for assigning less weight to the opinion, substantial evidence supported the ALJ's rejection of the opinion.").

## ANALYSIS

In his MSJ, the Plaintiff raised three arguments—all unavailing.

### I.   THE TREATING PHYSICIAN'S OPINIONS

The Plaintiff first argued that the ALJ improperly gave Dr. Segall's opinions "diminished weight." Pl.'s MSJ at 7–14. The Plaintiff detailed Dr. Segall's notes from the several visits between June 2016 and June 2019. *Id.* at 8–10. And, while he acknowledged that Dr. Segall's findings "var[ied] slightly from visit to visit, or assessment to assessment," the Plaintiff contended that, "on the whole[,] [Dr. Segall's opinions] are consistent with his documented exam findings, and establish[ed] that [the Plaintiff] is capable of far less than the medium exertional work the ALJ concluded he was capable of performing." *Id.* at 10. The Plaintiff also tried to bolster Dr. Segall's opinions by pointing out that they were (1) consistent with the findings of other physicians, including those of Drs. Robert Mills and Dominic Carreira, *id.* at 11, and (2) generally consistent with the Plaintiff's medical history, *id.* at 11–13. Finally, the Plaintiff suggested that, in giving Dr. Segall's opinions diminished weight, the ALJ failed to consider some of the factors listed in 20 C.F.R. § 404.1567(c). *Id.* at 14. In saying so, however, the Plaintiff (notably) didn't specify which of these factors (he believed) the ALJ had missed. *Id.*

Magistrate Judge Hunt found these arguments unpersuasive. In Judge Hunt's estimation, the ALJ (1) had plainly enumerated several inconsistencies in Dr. Segall's findings and (2) had discounted Dr. Segall's opinions appropriately. *See* Report at 5. Magistrate Judge Hunt described five of these discrepancies, which he found to be significant. *Id.* at 8. The limited overlap between Dr. Segall's

8

findings and those of other physicians thus didn't (in the Magistrate Judge's view) undermine the ALJ's decision to deem Dr. Segall's overall findings less credible. *Id.* at 7. Lastly, Magistrate Judge Hunt concluded that the ALJ had properly considered the factors set out in 20 C.F.R. § 404.1527(c). *Id.* at 9.

The Plaintiff objects to the Report's conclusions regarding the weight the ALJ gave to Dr. Segall's opinions. *See* Objections at 1–9. We overrule those objections and adopt Magistrate Judge Hunt's analysis. The ALJ unambiguously explained that he was affording Dr. Segall's opinions less weight because of several inconsistencies in his medical findings and recommendations—a reason the Eleventh Circuit has recognized as "good cause" for rejecting a physician's opinions. *See Pritchett*, 315 F. App'x at 810 ("'Good cause' exists when the . . . treating physician's opinion was . . . inconsistent with the physician's own medical records."). The ALJ also cited extensively and meticulously to the record, *see* ALJ Decision at 4–11, and he didn't simply give "conclusory statements regarding alleged inconsistencies between . . . treatment notes and assessments without identifying any inconsistencies," *Perez v. Comm'r of Soc. Sec.*, 625 F. App'x 408, 416 (11th Cir. 2015).

We also find that there was "substantial evidence" supporting the ALJ's determination regarding Dr. Segall. Again, in the Social Security context, that means only that there was "more than a scintilla" of evidence, acceptable to the reasonable person "as adequate to support [the ALJ's] conclusion." *Lewis*, 125 F.3d at 1440. To be sure, some of the Plaintiff's arguments about the incongruities between the June 2016 and January 2017 reports *might* have some force on initial review. For example, as the Plaintiff correctly points out, he did show *some* improvement between June 2016 and August 2016. *See* Objections at 2. These included increased "dorsiflex" and "less noticeable atrophy." *Id.* And those improvements *might* have justified Dr. Segall's assessment that the Plaintiff *could* stand for longer. *See id.* Nonetheless, the ALJ recognized that the Plaintiff's medical status had been "*primarily*" unchanged over those two months, *see* ALJ Decision at 10 (emphasis added), and we

9

aren't in a position to say whether increased "dorsiflex" and less noticeable muscle atrophy were significant enough to justify the substantial alterations we find in Dr. Segall's evaluation. In other words, the Plaintiff attacks only the *materiality* of Dr. Segall's inconsistencies, *see* Objections at 5 (acknowledging that the opinions "var[ied] *slightly* from visit to visit, or assessment to assessment" (emphasis added)), and asks us to substitute our own judgment for the ALJ's—something we cannot do, *even if* we think that the "evidence preponderate[d] against the [ALJ's] decision," *Bloodsworth*, 703 F.2d at 1239.

In any event, of the five inconsistencies on which the ALJ relied, at least two lend ample support to the ALJ's credibility determination.

*First*, the ALJ cited the internal inconsistency in Dr. Segall's June 7, 2016 report. *See* ALJ Decision at 8–10. There, remember, Dr. Segall had limited the Plaintiff to walking no more than 10–15 minutes per hour and carrying no more than 10–20 pounds. *See id.*; R. at 637–40. In that *same* visit, however, Dr. Segall limited the Plaintiff to 15–20 minutes of walking per hour and carrying 20–30 pounds. *See id.*; R. at 637–40. The Plaintiff doesn't disagree that these recommendations were inconsistent—nor does he suggest that these disparities (of a multiple of 1.5 to 1.67) were trivial. *See* Objections at 2. Instead, he claims for the first time that Dr. Segall kept two "versions" of his notes and that "one [of the versions] *appears* to be a revision of the earlier version." *Id.* (emphasis added); *see also id.* ("Although the Magistrate does not acknowledge as much, Dr. Segall *apparently* reassessed his initial findings and opinions and issued a revised opinion, which he is free to do." (emphasis added)).

But the ALJ relied on this discrepancy in reducing the weight he gave to Dr. Segall's opinions, *see* ALJ Decision at 8–9, and the Plaintiff didn't raise this *new* argument—that there were original and revised versions of the notes—to the Magistrate Judge, *see generally* Pl.'s MSJ.[6] We thus decline to

---

[6] To the contrary, the Plaintiff conceded to the Magistrate Judge that Dr. Segall's opinions "var[ied] slightly" from assessment to assessment. *See* Pl.'s MSJ at 10.

consider the argument at this late stage of the case. *See Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) ("[A] district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge."); *see also Powell v. Burger Docs Atlanta, Inc.*, 2021 WL 4192864, at *6 (N.D. Ga. Sept. 14, 2021) ("[A]n objection to a report and recommendation is not the place to assert new factual allegations."). Even if the Plaintiff had preserved the argument, though, we would reject it as speculative. As the Plaintiff acknowledges—through his use of the words "appears" and "apparently"—there isn't *any* evidence that Dr. Segall kept original and revised notes of that exam. Nor, by the way, does the Plaintiff adduce any evidence as to *why* Dr. Segall would have needed to update his report that same day—a significant change that, if anything, justifies the ALJ's decision to afford the opinion diminished weight.

*Second*, the ALJ relied on Dr. Segall's inconsistent findings from a more recent exam in June 2019. *See* ALJ Decision at 10. At that exam, Dr. Segall "opined the claimant could never use bilateral foot controls"—but, "in the same form[,] he stated the claimant could occasionally operate a motor vehicle and[,] after the physical exam, he noted the claimant could drive with his affected foot." *Id.* Dr. Segall also "assessed the claimant capable of standing or walking no greater than 30 to 40 minutes per hour divided equally; however, in the completed form he opined the claimant could only stand 10 to 15 minutes at a time and could only stand 4 hours total in a day." *Id.* Again, the ALJ found it notable (and suspicious) that "both forms were complete[d] on the same day." *Id.* at 11.

In his MSJ, the Plaintiff didn't even address this June 2019 exam. *See generally* Pl.'s MSJ. And, although Magistrate Judge Hunt referred to the June 2019 exam in recommending that we affirm the ALJ Decision, *see* Report at 6, the Plaintiff failed to address this exam in his objections, *see generally* Objections. He's therefore waived any claim that the ALJ misconstrued, misrepresented, or miscited the evidence from this June 2019 exam. *See, e.g., Robinson v. Astrue*, 235 F. App'x 725, 726 (11th Cir.

11

2007) (holding that a claimant waived an argument regarding an ALJ decision when he didn't raise it in the district court).

In the end, then, we conclude that the inconsistencies in these two reports—June 2016 and June 2019—gave the ALJ "good cause" to afford Dr. Segall's opinions less weight. *See, e.g.*, *Petteway*, 353 F. App'x at 290 ("Because 'good cause' existed to reject the opinion of [the claimant's] treating physician, and the ALJ provided specific reasons for assigning less weight to the opinion, substantial evidence supported the ALJ's rejection of the opinion.").[7] We thus affirm this aspect of the Report.

## II. RFC FINDING

Before the Magistrate Judge, the Plaintiff argued that the ALJ's RFC finding wasn't supported by substantial evidence. *See* Pl.'s MSJ at 14–16. In particular, he claimed (1) that the ALJ overestimated his capacity to stand, walk, and carry, given the record evidence and, more specifically, Dr. Segall's opinions; and (2) that the ALJ's RFC finding was inconsistent with his knee and shoulder pain, as documented in Dr. Richard Linn's exam notes. *Id.* at 15.

Magistrate Judge Hunt disagreed, finding that the Plaintiff had ignored the "significant postural and environmental limitations that the ALJ included in his assessment." Report at 10. He also reiterated that the ALJ was entitled to discount Dr. Segall's opinions. *See id.* at 10–11. And, considering the entire record, the Magistrate Judge found the ALJ's conclusion—that the Plaintiff wasn't suffering nearly as much as he claimed to be—reasonable. *Id.* at 11. In the Magistrate Judge's view, the ALJ

---

[7] Because there's substantial evidence supporting the ALJ's decision to afford Dr. Segall's opinion diminished weight, we needn't consider the Plaintiff's point (Objections at 7–9) that *some* of Dr. Segall's opinions were consistent with other evidence in the record. *See Lopez v. Comm'r of Soc. Sec.*, 2020 WL 6579787, at *1 (S.D. Fla. Nov. 10, 2020) (Scola, J.) ("As long as the ALJ's findings are supported by substantial evidence, they are conclusive, and the Court must defer to the ALJ's decision even if the evidence may preponderate against it." (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004))). The Plaintiff also doesn't challenge Magistrate Judge Hunt's conclusion that the ALJ amply considered the factors set forth in 20 C.F.R. § 404.1527(c). *See* Report at 9; *see generally* Objections. And, finding no clear error in that portion of the Report, we likewise adopt it here. *See Thomas*, 474 U.S. at 150.

cited ample evidence in support of that determination—including, for example, the following undisputed facts: that the Plaintiff "does household chores, cooks, drives, shops, fishes, and rides a 600-pound motorcycle, using his feet to shift gears and using his toes to balance when stopped." *Id.*

Regarding the Plaintiff's knee and shoulder issues, Magistrate Judge Hunt clarified that, while "the ALJ did not delve into the intricate details of these impairments, he considered them and their effect on Plaintiff's RFC." *Id.* at 11–12. In particular, the ALJ found that the impairments "may have caused more than minimal limitation in the short-term, but responded well to treatment, with improved symptomatology, and therefore failed to meet the durational requirement of causing more than minimal limitation for at least 12 months to be considered severe." *Id.* at 12. And, the Magistrate Judge noted, the ALJ wasn't required to consider an impairment that lasted *fewer* than 12 months. *Id.* at 13. Beyond that, the Magistrate wrote, the ALJ had substantial evidence for his position that the impairments weren't severe—especially since he "cited four exhibits that tended to show the residual effects of these impairments after treatment were insignificant." *Id.* at 12. There also wasn't any evidence that the "impingement syndrome in Plaintiff's right shoulder or his knee impairment limited his capacity to conduct work beyond what the ALJ assessed. *Id.* As a result, the Plaintiff's contention—that the ALJ *would have* found his work capabilities "more limited" had he carefully assessed the evidence—was, in the Magistrate Judge's view, mere speculation. *Id.* Indeed, as Magistrate Judge Hunt pointed out, the Plaintiff's "shoulder exam revealed largely normal results"—and, during a January 2017 visit with Dr. Linn, the Plaintiff "did not even complain of any shoulder pain." *Id.* And, regarding the iliotibial band friction syndrome in the Plaintiff's right knee, "Dr. Linn noted that Plaintiff had full lower extremity strength and sensation." *Id.*

Magistrate Judge Hunt also found that, after conducting a careful review of the medical opinions, the ALJ properly concluded that they didn't support the Plaintiff's claim to a highly limited RFC. *Id.* at 13. For example, the ALJ cited to (1) Dr. Steinlauf's refusal to sign the Plaintiff's unable-

13

to-work paperwork because it was inconsistent with his medical evaluations, and (2) the reports of other physicians who determined that the Plaintiff had full muscle strength, negative Tinel's signs, and little to no sensory deficits. *Id.* at 13. Finally, Magistrate Judge Hunt pointed out that the Plaintiff was able to mitigate the intensity, persistence, and limiting effects of his symptoms. *Id.* The Plaintiff, for instance, responded well to physical therapy and cortisone injections, which alleviated his symptoms. *Id.* at 13–14. The Plaintiff's contention that his symptoms were completely unmanageable was therefore unsupported by the record. *Id.* at 14.

In his objections, the Plaintiff maintains that the ALJ "overestimate[d]" his ability to stand, walk, and carry a significant amount of weight. *See* Objections at 9. On this point, though, he says only that the RFC finding was "inconsistent with the record as a whole and inconsistent with the opinions of Dr. Segall." *Id.* As we've explained above, the ALJ was entitled to discount Dr. Segall's opinions, and the Plaintiff hasn't pointed to any *other* errors in Magistrate Judge Hunt's analysis. Indeed, he hasn't even tried to explain why the relevant facts the Magistrate Judge outlined—his daily activities, for instance, or Dr. Steinlauf's refusal to sign the unable-to-work paperwork—were legally inadequate to support the ALJ's decision. *See generally id.* Nor does he address Magistrate Judge Hunt's point about his ability to manage his impairments. *See generally id.* The Plaintiff, in sum, hasn't properly objected to this aspect of the Report. *See, e.g.*, *Buffington v. Comm'r of Soc. Sec.*, 2012 WL 3715107, at *1 (M.D. Fla. Aug. 28, 2012) (explaining that the district court "need not address Plaintiff's conclus[ory] objection" that simply "renew[ed] all of the arguments raised in Plaintiff's brief"). And we find no clear error in the Report's conclusion that the record evidence supported the ALJ's RFC finding. *See Lewis*, 125 F.3d at 1440 ("Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). Even under a *de novo* review of the Report, however, we'd reject the Plaintiff's position. As we've explained, the ALJ was more than justified in

14

downgrading Dr. Segall's credibility, and the record evidence amply supported the ALJ's RFC determination.

As for the knee and shoulder impairments, the Plaintiff doesn't object to Magistrate Judge Hunt's conclusion that those impairments didn't meet the durational requirements set forth in the Social Security regulations. *See generally* Objections. To the contrary, the Plaintiff cites only exams that span from August 2016 to February 2017—which, it's almost tautological to say, document a period of *less* than one year. *See id.* at 9–10. We therefore find no clear error in Magistrate Judge Hunt's duration conclusion and adopt this portion of the Report as well. *See* 20 C.F.R. § 416.909 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement."); *see also Williamson v. Berryhill*, 2019 WL 12661165, at *17 (S.D. Fla. Mar. 6, 2019) (Otazo-Reyes, Mag. J.) ("A severe impairment is one that significantly limits a claimant's physical or mental ability to do basic work activities. Such an impairment must be severe for at least 12 consecutive months to be considered a severe impairment at step two of the sequential process."). We also note that, in his objections, the Plaintiff re-cites the same aspects of Dr. Linn's exams he'd already cited in his MSJ—but he omits *any* mention of the four exhibits on which the ALJ relied in finding that his knee and shoulder impairments weren't severe. *See* ALJ Decision at 4 (citing Exs. 10F, 13F, 14F, and 20F); *see generally* Objections. The Plaintiff also doesn't account for Magistrate Judge Hunt's view that Dr. Linn's shoulder exam "revealed largely normal results." Report at 12 (citing R. at 868, 872); *see generally* Objections. We thus adopt Magistrate Judge Hunt's analysis on these points, too.

To recap: the Plaintiff has failed, in any meaningful way, to address (let alone rebut) the evidence the ALJ cited in support of his position. Because we cannot "reweigh the evidence, or substitute [our] judgment" for the ALJ's—even if the "evidence preponderates against the [ALJ's] decision," *Bloodsworth*, 703 F.2d at 1239—we affirm.

### III. SYMPTOMS AND LIMITATIONS

In his MSJ, the Plaintiff insisted that, in assessing his allegations of pain, the ALJ had failed to adhere to the strictures of 20 C.F.R. § 404.1529. *See* Pl.'s MSJ at 17–18. Magistrate Judge Hunt found that (1) "the ALJ took seriously Plaintiff's allegations of pain" and (2) the ALJ properly concluded that "there [was] substantial non-medical evidence undermining the claimed degree of discomfort." Report at 15. That evidence included *both* the Plaintiff's admitted household activities *and* his ability to mitigate the extent of his pain through medication, injections, and physical therapy. *Id.* at 15–16.

The Plaintiff objects and—in one conclusory sentence—"maintains that [his] self-reported symptoms and limitations are entirely consistent with his own hearing testimony as well as his treating and examining sources' findings and opinions," and that "his allegations of disabling impairments should not have been discounted to the extent the ALJ did so in the crafting of his rationale." Objections at 11. In saying so, however, the Plaintiff basically regurgitates, in one sentence, all of the arguments he pressed before the Magistrate Judge. This he cannot do. *See, e.g.*, *Leatherwood v. Anna's Linens Co.*, 384 F. App'x 853, 857 (11th Cir. 2010) (holding that the only objections entitled to *de novo* review are "objections that identif[y] specific findings set forth in the R&R and articulate[ ] a legal ground for objection"); *Buffington*, 2012 WL 3715107, at *1 (explaining that the district court "need not address Plaintiff's conclus[ory] objection" that simply "renew[ed] all of the arguments raised in Plaintiff's brief"). We therefore review this portion of the Report for clear error and, finding none, adopt it as well. At any rate, for all the reasons we've outlined, the ALJ didn't err in concluding that the Plaintiff's impairment allegations were unsupported by the medical evidence.

\*\*\*

Having carefully reviewed the record, the briefing, the Report, and the Plaintiff's Objections, the Court hereby **ORDERS AND ADJUDGES** as follows:

1. The Report [ECF No. 23] is **ACCEPTED and ADOPTED**.

2. The Objections [ECF No. 24] are **OVERRULED**.

3. The Pl.'s MSJ [ECF No. 21] is **DENIED**.

4. The Def.'s MSJ [ECF No. 22] is **GRANTED**.

5. Pursuant to Federal Rule of Civil Procedure 58, final judgment will be entered separately.

6. The Clerk of Court shall **CLOSE** this case. All other pending motions are **DENIED as moot**. And all other deadlines are **TERMINATED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 27th day of September 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record